## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Daniel D. Domenico

Civil Action No. 1:19-cv-03530-DDD-NYW

JOHN DOE through his mother and next friend JANE DOE,

     Plaintiff,

v.

ROCKY MOUNTAIN CLASSICAL ACADEMY;
NICOLE BLANC, individually and in her official capacity as Dean of
Students of Rocky Mountain Classical Academy; and
CULLEN McDOWELL, individually and in his official capacity as
Executive Principal of Rocky Mountain Classical Academy,

     Defendants.

---

## ORDER DENYING MOTION FOR
## PRELIMINARY INJUNCTION

---

Before the Court is Plaintiff's Fed. R. Civ. P. 65 Motion for a Tempo-
rary Restraining Order and an Order to Show Cause Why a Preliminary
Injunction Should Not Be Granted. [Doc. 13.]

Rocky Mountain Classical Academy is a public charter school that
prides itself on its rigorous, classical academic program and traditional
ways. Among those ways is a strict, conservative uniform policy that in-
cludes a prohibition on most jewelry other than small earrings on girls.
Plaintiff John Doe[1] is a six-year-old boy. Last August, he enrolled in

---

[1]   Plaintiff brings suit through his mother and next friend. To protect
the privacy interests of this young Plaintiff, the Court has granted leave
for him and his family members to proceed under pseudonyms. [*See* Mot.
for Leave to Proceed Anonymously, Doc. 16; Courtroom Minutes, Doc. 31
at 1 (granting motion for leave).] The parties to the action and the Court
are aware of Plaintiff's true name and identity.

kindergarten at RMCA. But in July, he had gotten his ears pierced. He and he and his parents want him to be able to wear his earrings to school. RMCA has refused to change its policy, forcing John to choose between the school or his earrings. He has thus far chosen to wear his earrings to school in violation of the policy, and the school has begun disciplinary actions that have included suspensions and could lead to expulsion in the near future.

Thus it is that a kindergarten dress code has become a federal case, pitting fundamentally important constitutional concepts against one another. The Does urge that the uniform policy, by allowing girls to do something boys cannot, denies John the equal protection of the laws guaranteed by the Fourteenth Amendment. The school argues that judicial intervention with its uniform policy would contravene decades of deference shown to local educational authorities by federal courts, deference born of the very structure of the Constitution, which limits the reach of federal judges via both separation of powers and the federalist system.

Both are important principles, and the Court's duty is to uphold them both. But in this case, under governing law and based on the evidence before the Court at this early stage, it does not appear that the school is denying John the equal protection of the laws, and so it is the school's position that is likely to prevail. Plaintiff's motion for a preliminary injunction is denied.

## BACKGROUND

John Doe is a six-year-old kindergarten student at RMCA. RMCA is a public charter school in Colorado Springs, Colorado that accepts kindergarten through 8th grade students and operates within Colorado School District 49.

John had his ears pierced in early July 2019. On July 18, 2019, his mother, Jane Doe, signed an RMCA "Multi-Purpose Form" for John and his sister, acknowledging that she had "read the RMCA Parent-Student Handbook, understand its contents, and agree to help promote a safe, effective learning environment by abiding by its policies and procedures." [Ex. 101; Jane Doe Aff., Doc. 15 at ¶ 7.] The RMCA Parent-Student Handbook includes a uniform policy that states in relevant part: "Tattoos and body piercings, other than girls' earrings, are not allowed. Earrings must be limited to one earring per ear. Large, dangling, or hoop-type earrings are not allowed. Jewelry other than watches for boys or girls, and small earrings on girls, may not be worn." [RMCA Parent-Student Handbook, Doc. 22-1 at 43.] John's earrings are small, blue, and consistent with RMCA's uniform policy as it applies to female students. [Jane Doe Aff., Doc. 15 at ¶ 11.]

Prior to the beginning of the school year, RMCA staff conducted various learning assessments on John. John wore his earrings to those assessments, and no staff member expressed any concern regarding his earrings or RMCA's uniform policy. [*Id.* at ¶ 9.] The school year began on August 8, 2019. John consistently wore his earrings to school from the beginning of the year. [*Id.* at ¶ 10.] On August 27, John's kindergarten teacher emailed Ms. Doe to inform her that "per our dress code, boys [cannot] wear earrings at school." [*Id.* at ¶ 12.] Ms. Doe responded that she believed RMCA's earring policy was discriminatory and requested a formal meeting to discuss the policy. [*Id.* at ¶¶ 13-15.]

Three days later, Ms. Doe met with the RMCA dean of students and the executive principal. [*Id.* at ¶ 15; McDowell Aff., Doc. 22-2 at ¶ 12.] Ms. Doe explained her position that the school's earring policy is discriminatory, and the executive principal agreed to consider the issue and respond definitively the following week. [McDowell Aff., Doc. 22-2 at

¶¶ 12-15.] He also told Ms. Doe that he did not make the uniform policy, and it was only his job to enforce it; he told Ms. Doe that if she had further issues with the uniform policy, she needed to contact the RMCA board of directors for recourse. That same day, Ms. Doe requested a formal meeting with the RMCA board of directors. [Jane Doe Aff., Doc. 15 at ¶ 17; McDowell Aff., Doc. 22-2 at ¶ 16.] On September 4, 2019, the executive principal contacted Ms. Doe and informed her that after considering the issue further, he had decided that John must abide by the uniform policy, including the prohibition on earrings for male students. [McDowell Aff., Doc. 22-2 at ¶ 17.]

The next RMCA board meeting was not until December 3, 2019. [Jane Doe Aff., Doc. 15 at ¶ 20; McDowell Aff., Doc. 22-2 at ¶ 19.] In the interim, John Doe continued to wear his earrings to school, and the school notified Ms. Doe several times via email and "Oops Slips" that John was in violation of the uniform policy. [Jane Doe Aff., Doc. 15 at ¶ 18.] The RMCA board of directors took up the issue at its public meeting in December. [McDowell Aff., Doc. 22-2 at ¶ 19.] Ms. Doe and John's father attended the meeting, but apparently due to some miscommunication or procedural confusion, they did not speak or address the board. [Jane Doe Aff., Doc. 15 at ¶ 21; McDowell Aff., Doc. 22-2 at ¶ 20.] The board discussed the issue and unanimously agreed not to make any changes to the uniform policy. [McDowell Aff., Doc. 22-2 at ¶ 21.] Two days later, the school's attorney sent Ms. Doe a memorandum explaining the legal basis for the board's decision. [*Id.* at ¶ 22; Memorandum Decision, Doc. 23.] The executive principal then informed Ms. Doe that John would need to comply with the uniform policy by the following Monday, December 9, 2019. [Jane Doe Aff., Doc. 15 at ¶ 23; McDowell Aff., Doc. 22-2 at ¶ 23.]

John continued to wear his earrings to school the week of December 9, 2019. [Jane Doe Aff., Doc. 15 at ¶ 24; McDowell Aff., Doc. 22-2 at ¶ 24.] On December 11, 2019, John was suspended for violating the uniform policy, and he was suspended again on December 12, 2019. [Jane Doe Aff., Doc. 15 at ¶¶ 25-29; McDowell Aff., Doc. 22-2 at ¶¶ 25-26.] On December 12, the school met with Ms. Doe, who stated that John would continue to wear his earrings; the school then informed her that it would begin the process of dis-enrolling John. [Jane Doe Aff., Doc. 15 at ¶¶ 27-31.] Ms. Doe was informed that John could continue to attend RMCA through Friday, December 20, 2019. [*Id.* at ¶ 31.]

On December 13, Plaintiff filed this suit. [Compl., Doc. 1.] Plaintiff brings claims for violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688. [*Id.* at ¶¶ 55-101.] On December 18, Plaintiff filed the motion for preliminary injunction currently before the Court. [Mot. for Prelim. Inj., Doc. 13.] At that time, Plaintiff sought a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) and an order to show cause why a preliminary injunction should not issue pursuant to Rule 65(a). [*Id.* at 1-2, 12.] Because the Court found the standard for issuing a TRO without notice had not been met, *see* Fed. R. Civ. P. 65(b)(1), the Court instead set an expedited briefing schedule and a hearing on the motion for preliminary injunction. [Order, Doc. 17.] Plaintiff seeks an injunction requiring RMCA to cease all actions to remove or dis-enroll John from school and to allow John to continue to attend school wearing his earrings. [Mot. for Prelim. Inj., Doc. 13 at 1, 12.]

On December 20, the executive principal of RMCA notified Ms. Doe that RMCA had made a formal recommendation to District 49 that John be removed from RMCA either through expulsion or transfer to a

District school. [McDowell Aff., Doc. 22-2 at ¶¶ 27-28.] On December 28, District 49 informed RMCA that the District would delay consideration of RMCA's request to expel or transfer John pending this Court's ruling on the motion for preliminary injunction. [*Id.* at ¶ 29.] On January 7, 2020, John returned to school following the winter break. He has continued to wear his earrings, and RMCA has continued to issue John suspensions of escalating duration for violations of the uniform policy. If John is expelled from RMCA, other public schools in Colorado will have discretion to deny him enrollment.

On January 14, 2020, the Court held a hearing on the motion for preliminary injunction, at which it received evidence; heard testimony from Jane Doe, the executive principal of RMCA, and the president of RMCA's board of directors; and heard the arguments of counsel. This order follows.

## APPLICABLE LAW

### I.   Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019). To succeed on a motion for preliminary injunction, the moving party must show: (1) that it is "substantially likely to succeed on the merits"; (2) that it will "suffer irreparable injury" if the court denies the injunction; (3) that its "threatened injury" without the injunction outweighs the opposing party's under the injunction; and (4) that the injunction isn't "adverse to the public

interest."[2] *Id.* If the injunction sought is of a "disfavored" type, the moving party must make a "strong showing" that the first and third factors weigh in its favor. *Id.* A disfavored preliminary injunction is one that: (1) mandates action (rather than prohibiting it); (2) changes the status quo; or (3) grants all the relief that the moving party could expect from a trial win. *Id.*

The first and third of these disfavored types do not appear to be implicated here. But the Defendants contend that Plaintiff seeks to disturb the status quo, while Plaintiff argues the injunction would maintain the status quo. The "status quo" is defined as "the last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 798 n.3 (quoting 11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948 (3d ed. & Nov. 2018 update)). From Plaintiff's perspective, the status quo is that he has been enrolled at RMCA and wearing his earrings to school since the beginning of the school year, and the dispute developed nearly a month after school started, when his teacher informed Ms. Doe for the first time that he could not wear his earrings at school. From Defendants' perspective, the status quo is that the school has a longstanding uniform policy that they have been and currently are fully able to enforce as to all students, and the dispute developed when John began wearing earrings to school in defiance of the rule that he now seeks to alter through court intervention.

---

[2]   In their briefs, both parties cite to the requirements for obtaining a preliminary injunction under Colorado law. [*See* Mot. for Prelim. Inj., Doc. 13 at 4-5; Defs.' Resp., Doc. 22 at 6-7.] The Colorado standard is similar, but not identical to the federal standard adopted by the Tenth Circuit, which is what governs this Court.

The Defendants have the better of this argument. While it is true that John wore his earrings to school for some time before being disciplined, there is no doubt that he was in violation of the policy. That the school elected not to immediately pursue its disciplinary process to the fullest extent at the start of the school year and while the Does pursued possible changes to the policy via appeal to the board should not be held against Defendants. Doing so would discourage any sort of pre-litigation grace or compromise in similar circumstances, which is not in anyone's interest. The fact of the matter is that the purpose of the injunction sought here is to stop a disciplinary process that has already begun, and to render unenforceable a provision of school policy. That is a change in the status quo.

In any event, whether or not the injunction would disturb the status quo, the result would be the same in this instance because the Plaintiff has not shown a substantial likelihood of success on the merits of his claims, even if the heightened disfavored-injunction standard is not applied. *See* Discussion, Part I, *infra*.

## II.  The Constitution and School Dress Codes

The Court notes at the outset that John Doe asserts only Equal Protection and Title IX claims based on the differential treatment of male and female students. He does not assert any First Amendment right to wear earrings based on freedom of expression or religion, nor does he assert any substantive Due Process right to wear earrings based on a liberty interest or otherwise. There is also no claim or allegation that John wishes to be treated as a girl; he is simply a boy who wants to wear earrings at school as a matter of personal preference. This is a pure Equal Protection case, based on the argument that boys are being treated less favorably than girls.

### A.   Equal Protection Analysis Generally

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The import of this clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

When a state action is challenged on Equal Protection grounds, courts apply different levels of scrutiny to the action based on what type of characteristic the state has used to distinguish one group of citizens from anther. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). At a minimum, a classification is subject to "rational-basis" review. *Clark*, 486 U.S. at 461; *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1110 (10th Cir. 2008). Under rational-basis review, a classification is valid if it is "rationally related to a legitimate governmental purpose." *Clark*, 486 U.S. at 461. More stringent levels of scrutiny attach to classifications that are based on certain "suspect" characteristics. *Price-Cornelison*, 524 F.3d at 1109; *see also City of Cleburne*, 473 U.S. at 440.

Sex is considered a "quasi-suspect" classification that requires "intermediate scrutiny." *Price-Cornelison*, 524 F.3d at 1109; *Free the Nipple-Fort Collins*, 916 F.3d at 802. To withstand intermediate scrutiny, a sex-based classification must have an "exceedingly persuasive justification," which means that (1) the classification must serve an important governmental objective; and (2) the sex-based means employed must substantially serve that objective. *United States v. Virginia*, 518 U.S. 515, 524 (1996); *Craig v. Boren*, 429 U.S. 190, 197 (1976).

## B. Court Oversight of School Dress Codes

Although students do not "shed their constitutional rights . . . at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), judicial interference in the operation of public schools "raises problems requiring care and restraint." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). "By and large public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Id*. The Supreme Court "has long recognized that local school boards have broad discretion in the management of school affairs." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863 (1982); *see also New Rider v. Bd. of Educ. of Indep. Sch. Dist. No. 1, Pawnee Cty., Okla.*, 480 F.2d 693, 699-700 (10th Cir. 1973) ("[I]t is only where state action impinges on the exercise of fundamental constitutional rights or liberties that the court may interfere with its dedication to local control of education.").

Students' constitutional rights must be "applied in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker*, 393 U.S. at 506). Thus, the rights of public school students "are not automatically coextensive with the rights of adults in other settings," *id.*, and state action that is impermissible in other spheres may be appropriate in the school setting, *Ebonie S. v. Pueblo Sch. Dist. 60*, 695 F.3d 1051, 1056 (10th Cir. 2012).

### 1. The Tenth Circuit's Deferential Approach

There are a number of cases dealing with constitutional challenges to dress codes. The most analogous Tenth Circuit cases are hair length

cases from the 1970s, in which the Circuit evaluated school grooming codes that prohibited long hair for male students. *See Freeman v. Flake*, 448 F.2d 258 (10th Cir. 1971); *New Rider*, 480 F.2d 693; *Hatch v. Goerke*, 502 F.2d 1189 (10th Cir. 1974). In those cases, the Tenth Circuit repeatedly and consistently declined to interfere with the schools' discretion to promulgate and enforce dress and grooming codes for students. *See Freeman*, 448 F.2d at 261 ("The states, acting through their school authorities and their courts, should determine what, if any, hair regulation is necessary to the management of their schools."); *New Rider*, 480 F.2d at 700 ("We believe that we would create a veritable quagmire for school boards, administrators, and teacher personnel, to attempt to wade through in their promulgation and enforcement of dress-hair codes which they may deem necessary . . . ."); *Hatch*, 502 F.2d at 1192 ("[T]he complaint against the hair style regulation lacks constitutional substance" and does not "directly and sharply implicate basic constitutional values.").

Of these Circuit cases, only *New Rider* explicitly involved an Equal Protection claim.[3] In that case, the court applied rational-basis review, and found that the male hair-length regulation at issue bore "a rational relationship to a state objective, *i.e.*, that of instilling pride and initiative among the students lending to scholarship attainment and high school spirit and morale." 480 F.2d at 693. Based on this holding, Defendants contend that this Court must apply rational-basis review to the male

---

[3]   In *Freeman*, there was "[n]o apparent con[s]ensus . . . as to what constitutional provision afford[ed] the protection sought," and the plaintiffs relied "variously . . . on the First, Fourth, Eighth, Ninth, Tenth, and Fourteenth Amendments . . . and on the penumbra of rights assured thereby." 448 F.2d at 260. In *Hatch*, the plaintiffs asserted a parental right to raise their children according to their own religious, cultural, and moral values rooted in the First, Fifth, and Fourteenth Amendments. 502 F.2d at 1191-92.

earring ban at issue in this case. But *New Rider* predates the Supreme Court's decisions in *Craig v. Boren* and its progeny, which hold that sex is a quasi-suspect classification that requires intermediate scrutiny. *See Boren*, 429 U.S. 190; *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982); *Virginia*, 518 U.S. 515; *see also Free the Nipple-Fort Collins*, 916 F.3d 792. Indeed, the Tenth Circuit in *New Rider* explicitly stated that no suspect classification was at issue in that case. 480 F.2d at 698, 700. So, while *New Rider* is useful and important in expressing the deference with which federal courts should approach school decision-making, it is not binding on this Court with respect to the level of scrutiny to be applied in this case.

### 2.   Other Authority

Outside of the Tenth Circuit, two recent decisions are instructive as to the analysis that the Court should apply to the school dress code rule at issue here. First, both parties point to *Hayden v. Greensburg Community School Corp.*, where the Seventh Circuit evaluated a school policy that required boys' basketball players at a public high school to keep their hair cut short, while girls' basketball players were not subject to the same requirement. 743 F.3d 569 (7th Cir. 2014). The Seventh Circuit began its analysis by acknowledging the principle discussed above that intermediate scrutiny generally applies to sex-based classifications. *Id.* at 577. Yet the court focused its inquiry on "a discrete subset of judicial and scholarly analysis" that addresses "[w]hether and when the adoption of differential grooming standards for males and females amounts to sex discrimination." *Id.* This subset of precedent is a line of case law that addresses dress and grooming standards in the workplace under Title VII of the Civil Rights Act of 1964. *See id.* at 577-78 (collecting cases). Under this line of precedent, employers may differentiate between men and women in workplace dress codes, so long as the

differential standards imposed are part of a comprehensive dress code that imposes comparable burdens, consistent with community norms and not based on impermissible sex stereotypes, on both males and females alike. *Id.* at 577-78, 581.

Applying this precedent, the *Hayden* court found that the record lacked evidence both as to the broader set of grooming rules that were applicable to both male and female student-athletes, and as to whether longer hair on males "would be out of the mainstream among males in the Greensburg community at large, among the student body, or among school athletes." *Id.* at 578-82. Due to this lack of evidence, the court was forced to evaluate the male hair-length policy in isolation.[4] *Id.* In doing so, the court found that the school had articulated legitimate reasons for imposing grooming standards on student-athletes—namely, promoting team unity and projecting a positive image. *Id.* at 582. But the school had not shown that the sex-based distinction in hair-length policy substantially served those objectives because "so far as the record reveals, those interests are articulated and pursued solely with respect to members of the boys basketball team," and the defendants had not shown that those interests were served through comparable grooming standards for female athletes. *Id.* Accordingly, the court held that no exceedingly persuasive justification had been shown for restricting the hair length of male athletes alone, and the plaintiffs were entitled to judgment on their Equal Protection claim. *Id.*

---

[4]   The case had been jointly submitted to the district court for judgment based on a stipulated set of facts, and the district court ruled in favor of the defendants based on rationales that the Seventh Circuit rejected. 743 F.3d at 573, 579-80. The Circuit noted that had the district court instead granted a defense motion for summary judgment, it would have remanded the case for further proceedings on liability. *Id.* at 579.

Second, in *Peltier v. Charter Day School, Inc.*, the Eastern District of North Carolina evaluated a school uniform policy that required female students to wear skirts, skorts, or jumpers, while male students were required to wear shorts or pants. 384 F. Supp. 3d 579 (E.D.N.C. 2019). The district court applied *Hayden*'s "comparable burdens" analysis and found that the dress code requiring girls to wear skirts did not pass muster. *Id.* at 596. The court found that the skirts requirement imposed a differential burden on girls because it

> renders them unable to play as freely during recess, requires them to sit in an uncomfortable manner in the classroom, causes them to be overly focused on how they are sitting, distracts them from learning, and subjects them to cold temperatures on their legs and/or uncomfortable layers of leggings under their knee-length skirts in order to stay warm.

*Id.* at 597. The school's dress code did not impose any comparable burden on boys. *Id.* The court also found that the skirts requirement was inconsistent with community norms, given that "[w]omen (and girls) have, for at least several decades, routinely worn both pants and skirts in various settings, including professional settings and school settings."[5] *Id.* at 596 & n.7.

Finally, the court found that the skirts requirement did not substantially serve the school's proffered reasons for the rule—to foster a

---

[5] The plaintiffs had presented evidence showing that most public school dress codes across the country allowed girls to wear pants or shorts by the mid-1980s; female cadets at West Point have been permitted to wear trousered uniforms since the first coed class entered in 1976; and females began wearing pant suits on the Senate floor for the first time in 1993. *Peltier*, 384 F. Supp. 3d at 596 & n.7. The court also found that "there is no evidence that requiring girls to wear skirts on a daily basis is consistent with community standards of dress in Brunswick County or in North Carolina generally." *Id.* at 596.

"disciplined environment that has mutual respect between boys and girls" and to help the students "'act more appropriately' toward the opposite sex"—because girls were not required to wear skirts on certain days, and there was no evidence that the boys treated the girls differently or vice versa on those days. *Id.* at 596. Based on these findings, the court granted summary judgment to the plaintiffs on their Equal Protection claim. *Id.* at 597.

It is not entirely clear just how the "comparable burdens" test applied in *Hayden* and *Peltier* fits into the overarching intermediate scrutiny framework. Nor is it self-evident that the line of precedent addressing workplace dress codes under Title VII, while analogous, should necessarily be applied to school dress codes subject to an Equal Protection challenge. But the Court need not resolve these questions, because as discussed further below, based on the preliminary injunction record, the Court finds both that RMCA's prohibition on earrings for male students is part of a comprehensive school dress code that imposes comparable burdens on males and female students, and that the school has proffered a justification for the rule that withstands intermediate scrutiny.

## III. Title IX

Under Title IX, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There does not appear to be any dispute that RMCA receives federal financial assistance, or that it is subject to Title IX's ban on sex discrimination as a general matter. There is some question, however, as to whether Title IX applies to school personal-appearance codes like the uniform policy at issue here. *See Peltier*, 384 F. Supp. 3d at 589-90 (applying *Chevron*

deference to Department of Education's interpretation that Title IX does not apply to "discrimination in the application of codes of personal appearance"). But the Court need not resolve that question at this stage of the proceedings, because the parties agree that the standard for evaluating sex discrimination under Title IX mirrors that for evaluating sex discrimination under the Equal Protection Clause. Thus, if Title IX applies to RMCA's uniform policy, Plaintiff's likelihood of success on the merits of his Title IX claims does not differ in any material respect from his likelihood of success on his Equal Protection claim.

## DISCUSSION

### I.   Likelihood of Success on the Merits

Because John Doe is a boy, he is prohibited from wearing earrings to school; were he a girl, he would not be subject to that restriction. RMCA's dress code thus creates a sex-based classification on its face, and according to the Does, RMCA cannot justify this differential treatment of boys and girls. But the constitutional question is not so straightforward as that. None of the relevant decisions definitively and explicitly lays out the entire analytical framework for a case like this, but in general the Court agrees with the parties that *Hayden* comes closest and is persuasive.

Contrary to the Does' argument, *Hayden* does not hold that any dress or grooming code that imposes different rules for boys and girls is necessarily subject to intermediate scrutiny. Instead, the *Hayden* decision cites a litany of cases from around the country from the employment (Title VII) context, all of which reach the same basic conclusion: so long as the burdens of the dress code on both sexes are comparable and evenly enforced, the fact that there are different rules for each sex does not amount to sex discrimination. *See* 743 F.3d at 577-78 (collecting cases

from 4th, 5th, 6th, 7th, 8th, 9th, and D.C. Circuits). The *Hayden* court noted that the school in that case had not made the argument that a grooming "policy that applies only to male [students], but which is just one component of a set of grooming standards that impose comparable, although not identical, responsibilities on male[s] and female[s] . . . does not constitute sex discrimination." *Id.* at 579-80. That argument has been made here, and it is clear where the vast weight of precedent cited in *Hayden* points. If the RMCA uniform policy imposes comparable burdens on boys and girls, even though the rules for each sex are not identical, the policy does not constitute sex discrimination.

The Court will therefore address in turn (A) whether the school has shown that the earring policy is just one component of a comprehensive dress code that imposes comparable though not identical burdens on both male and female students; and (B) whether the school has proffered an exceedingly persuasive justification for the differential treatment of male and female students. If either is true, then the earring rule is not impermissibly discriminatory.

## A.  Comparable Burdens

RMCA's uniform policy encompasses approximately two-and-a-half pages of a fifty-six-page Parent-Student Handbook. [RMCA Parent-Student Handbook, Doc. 22-1 at 41-44.] The uniform policy contains numerous rules that apply equally to both sexes. For example:

- All clothing must be properly fitting and conservative in nature.

- Pants must not be too tight. On days when jeans are allowed . . . . jeans that are deemed too tight or have holes or rips are not allowed.

- Shorts . . . should be no shorter than two inches above the knee when sitting.

- Acceptable shirt styles . . . are: Short sleeve polos[,] Long sleeve polos[, and] Turtlenecks.

- Students in grade K-4 must have shirts tucked in at all times. Students in grades 5-8 may leave their shirts untucked.

- Shoes should have closed toe and closed heel. The shoes must have no lights. . . . Shoelaces must be solid in color and match an accent color in the shoe. . . . No shoes will go above the height of the standard high top athletic shoe. No shoes will have separated toes. No clogs or slides. No sandals or flip flops.

- Students must wear socks or tights at all times. Socks should be solid in color and should coordinate with uniform pants or shirts. . . . Socks must match one another.

- RMCA spirit wear hoodies . . . or pullover hoodies . . . with no logos or designs as well as cardigan, fleece, zip-up, or pullover sweaters in approved uniform colors are allowed in the classroom. All other out wear must remain in lockers or designated storage areas during the school day.

- Appropriate undergarments must be worn and not visible.

- Bracelets are not allowed.

- Necklaces may be worn but should be inside the shirt.

- Hairstyle and hair color must be conservative in nature. . . . Mohawk, faux hawk, no symbols, shapes, or designs of any kind shaved into the head or anything that inhibits the learning environment as determined by the campus administration. Hair may not be spiked. Large hair decorations may not be worn. Bandanas may not be worn. Highlights must be two tones lighter or darker than the student's natural hair color. No highlights that are not a natural hair color.

[*Id.*]

The uniform policy also contains a number of rules that are sex-specific, including the earring policy:

- Boys may wear classic navy or khaki colored pants or shorts. Girls may wear classic navy or khaki colored pants, shorts, capris, skirts or jumpers. . . . Girls in grades K-5 may wear polo style dresses.

- Girls may wear tights or leggings under their skirts.

- Camis for girls and undershirts for boys are allowed, but not required, and must not show.

- Tattoos and body piercings, other than girls' earrings, are not allowed. . . . Jewelry other than watches for boys or girls, and small earrings on girls, may not be worn.

- Boys' hair must not extend below the top of the shirt collar in the back, the bottom of the ears on the sides or the eyebrows in front.

[*Id.*]

The dress code is, as the school's witnesses described it, strict, traditional, and conservative, for both boys and girls. The only rules that differ for male and female students are that girls may wear capris, skirts, jumpers, or polo style dresses while boys may not; girls may wear earrings while boys may not; and girls' hair may be kept long while boys' hair may not. Plaintiffs contend that because all of the sex-based differences in the dress code place restrictions on boys that are not also placed on girls, the dress code does not place comparable burdens on both sexes—girls are permitted several freedoms that are not afforded to boys. Defendants contend that the sex-based differences within the dress code simply reflect community norms both in the Colorado Springs

community at large and within the RMCA community in particular, which strives to uphold traditional standards of conservative dress.

Having reviewed the RMCA uniform policy in its entirety, as well as the testimony and arguments of the parties, the Court finds that the policy imposes comparable burdens on students of both sexes. The uniform policy is comprehensive and thorough, and all students are subject to numerous restrictions designed to ensure a certain level of modest and conservative dress. This distinguishes this case from *Hayden*, in which the hair-length limitation was imposed only on male athletes, and the record lacked evidence as to what grooming standards were imposed on female athletes, preventing the court from evaluating whether the standards for both sexes were comparable.[6] In this case, to the extent that male students are subject to a handful more restrictions than female students, those restrictions are not particularly burdensome or onerous. There has been no allegation or testimony that John is somehow limited in what he can do at school if he is not allowed to wear earrings. The male earring ban here is thus distinguishable from the skirt mandate for female students in *Peltier*, which, the record showed, imposed a far more tangible burden on girls by inhibiting their ability to move and play freely and making them physically uncomfortable during the school day.

The only burden the Does have expressed here is that John wishes to wear his earrings as a matter of personal preference. But the entirety of RMCA's uniform policy is designed to place significant limits on the

---

[6] This also distinguishes the male earring ban in this case from the public-nudity ordinance struck down in *Free the Nipple-Fort Collins*, which imposed restrictions on female toplessness only. This perhaps explains why neither side cited this recent Tenth Circuit Equal Protection case in its brief.

choices and self-expression of students of both sexes when it comes to their appearance.

Ultimately, the uniform policy places the same essential burden on both boys and girls: they must limit their individuality and adhere generally to a traditional, conservative appearance. If the policy said simply that, there would be no argument that it was facially discriminatory. *Cf.*, *Harper v. Edgewood Bd. of Educ.*, 655 F. Supp. 1353, 1356 (S.D. Ohio 1987) ("The school dress code does not differentiate based on sex. The dress code requires all students to dress in conformity with the accepted standards of the community."). But as it is, the effect is the same, and the policy merely provides specific rules that fit that broader one. While that means girls have a few more options than boys when it comes to dresses, capris, earrings, and haircuts, that is simply a reflection of the community norms for what constitutes a traditional, conservative appearance for boys and girls. While it is not entirely uncommon in 2020 to encounter a male wearing earrings, long hair, or even a skirt, it can hardly be disputed that these things still remain less common style choices for males than for females. And RMCA's uniform policy is intended to reflect, as the school officials put it, a more restrictive, less-expressive, traditionally conservative community standard.[7] That traditional standard is not one that every student or every school might prefer, but nor does it impose excessive burdens on males. Conforming to that standard is every student's burden, and while not identical, it is legally comparable.

---

[7]   *Peltier* is again distinguishable here. In that case not only did the skirts requirement impose a tangible burden on girls, but it was inconsistent with community norms for even traditionally conservative settings.

- 21 -

Case 1:19-cv-03530-DDD-NYW   Document 33   Filed 01/20/20   USDC Colorado   Page 22 of 30

In sum, based on the preliminary injunction record, the Court finds that the prohibition on earrings for male students at RMCA is simply one component of a comprehensive uniform policy that imposes comparable, though not identical demands on male and female students.[8] Thus, while on its face the policy differentiates between boys and girls, the differential standards imposed do not constitute sex discrimination. And if so, then the policy would be subject to the highly deferential standard of review expressed by the Tenth Circuit in *Freeman*, *New Rider*, and *Hatch*, and would likely be upheld for the same reasons. Even if, however, one viewed a traditional dress code as imposing a discriminatory burden on boys, Defendants have proffered a justification for the school's earring policy that withstands intermediate scrutiny at the preliminary injunction stage.

### B.   Intermediate Scrutiny

To withstand intermediate scrutiny, the sex-based classifications in RMCA's uniform policy must substantially serve an important governmental objective. Defendants have articulated numerous important objectives that are served by the uniform policy generally. Specifically, Defendants state that "RMCA's dress code advances neutral pedagogical goals, such as upholding a high standard of excellence, reducing distractions, and creating an environment where all students are ready to learn. RMCA's Uniform Policy also fosters pride in RMCA as an institution, decreases cliques and individualism, and decreases concerns about wealth inequality." [McDowell Aff., Doc. 22-2 at ¶ 30; *accord* RMCA

---

[8]   As the case progresses through discovery, the parties might again cross swords on the issues of community norms, comparable burdens, whether the uniform policy is enforced equally as to both sexes, and whether a sex-specific accessory rule like the earring policy constitutes impermissible sex-stereotyping. *See Hayden*, 743 F.3d at 579-80.

- 22 -

Parent-Student Handbook, Doc. 22-1 at 41 ("RMCA upholds a high standard of excellence. Our school uniform is no exception. Please ensure that your student(s) are properly dressed and ready to learn when they come to school.").] The Court has no doubt that these are important educational objectives. *See Island Trees*, 457 U.S. at 864 ("[T]here is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political."); *New Rider*, 480 F.2d at 699 ("Common sense dictates that some uniform regulations are necessary in order to maintain order, spirit, scholarship, pride and discipline in the operation of . . . a school system.").

The question becomes, then, whether the differential treatment of male students substantially serves one or more of those objectives. In analyzing this question, the Court is mindful of the Supreme Court's and Tenth Circuit's directives that schools should be given substantial deference in the management of their affairs. Notably, the male plaintiffs in *New Rider* and *Hatch* wished to wear their hair in long braids that had religious, cultural, and racial significance to them as Native Americans. *See New Rider*, 480 F.2d 693; *Hatch*, 502 F.2d 1189. Yet even in those cases, where the hair-length limits interfered not just with the plaintiffs' personal desires, but their religious and racial identities, the court deferred to the schools' discretion to promulgate and enforce their own dress codes.

Even so, some of RMCA's proffered reasons for its uniform policy, while legitimate goals, are not served by the differential treatment of boys at issue here. For example, RMCA's desire to mitigate potential displays of wealth inequality justifies a general limit on the wearing of jewelry, but that goal is not advanced by limiting earrings to just one sex. *Cf. Crews v. Cloncs*, 432 F.2d 1259, 1266 (7th Cir. 1970) (short hair on males did not serve school's stated objective of safety in gym and

science classes, where females were permitted to wear long hair and safety could be accomplished by sex-neutral means such as requiring hair nets around Bunsen burners).

RMCA proposes two goals that the sex-based differences in its uniform policy advance. Perhaps its most persuasive argument is that the main appeal of the school itself is that it is a classically-focused, traditional school with a rigorous curriculum, in which students are expected to set aside their desires to express individuality through personal appearance while at school so that everyone can and will be focused on academics. School officials testified that this is a leading reason many families choose to attend RMCA, and that they believed eliminating the uniform policy, or even just the sex-specific portions of it or the male earring ban alone, would undermine their ability to pursue that goal.

It is perhaps relevant here that RMCA is a charter school. The very purpose of charter schools is to provide a variety of schooling models and options to parents and students. *See, e.g.*, C.R.S. § 22-30.5-102(2) (Purposes of enacting charter school statute include "[t]o encourage diverse approaches to learning and education and the use of different, innovative, research-based, or proven teaching methods" and "[t]o provide parents and pupils with expanded choices in the types of education opportunities that are available within the public school system"). Being "classical" and "traditional" is how RMCA seeks to differentiate itself. And so while the Does are certainly correct that RMCA's approach is not the only possible schooling model, or even the only model that works, their emphasis on the fact that other public schools nearby are able to effectively educate their students without implementing similar dress codes is beside the point. The same was undoubtedly true in the context of the *Freeman*, *New Rider*, and *Hatch* cases, but the Tenth Circuit recognized that it is not up to the federal courts to impose their own views on local

- 24 -

schools as to what might be the best educational model. Based on the preliminary injunction record, the Court finds that RMCA's goal of pursing a classical schooling model that includes deemphasizing individualism by enforcing traditional standards of conservative dress is substantially served by the comparable, albeit different, uniform restrictions placed on male and female students.

Secondly, RMCA also presented testimony that supports the proposition that the male earring ban substantially serves the stated objective of reducing classroom distractions. Defendants presented unrebutted testimony that school officials believe that boys wearing earrings would create distractions that girls' wearing them does not. The chair of the RMCA school board, for example, noted that when she encounters boys or men wearing earrings, "I notice. . . . I think, oh, wow. That guy's wearing earrings. That's not something you see all the time," but "[w]hen I see women wearing earrings, I don't notice." She stated that while as an adult, she is able to quickly process something out of the ordinary and go on about her day, kids in the classroom are not able to do that as easily. She and RMCA's executive principal both testified that they believed that such distractions would only be worse among elementary age children. They testified that RMCA's uniform policy is intended to create an environment free of such distractions so that students can focus on their schoolwork.

They also testified that if one part of the uniform policy is excised simply so a student can wear attire of his choosing, that will make it that much more difficult for the school to enforce other provisions of the uniform policy. The executive principal explained that exceptions to the policy are thus very rarely made, and only for medical reasons. [*See also* McDowell Aff., Doc. 22-2 at ¶¶ 8-9.] He testified that when changes to the uniform policy are made, they are not made lightly, and are made

only when it becomes clear that the majority of the community supports them, such as when the rule requiring tucked-in shirts was eliminated for older students. He also testified that there have been attempts by students in the past to buck or push the limits of the system, such as by wearing unauthorized large or hoop-type earrings. School officials fear that eliminating the earring prohibition for John would begin chipping away at the strict, academics-focused environment that the uniform policy (and the school itself) are meant to ensure.

Crafting a school dress code necessarily entails striking a balance between the rights of individual students and the rights of the whole in the functioning of the school. That not everyone, not even every school administrator or teacher or parent, would agree with the balance RMCA has chosen or the school's reasons for choosing it is irrelevant; the same could have been said about the facts in *Freeman*, *Hatch*, and *Free Rider*. This is precisely the sort of matter on which those cases emphasize the Court is bound to defer to the local officials charged with making such decisions. At this stage of the proceedings and on the record before it, the Court is persuaded that RMCA would likely be able to show that its prohibition on earrings for male students substantially serves the important objectives of upholding traditional, rigorous standards and reducing classroom distractions. *See Jones ex rel. Cooper v. W.T. Henning Elementary Sch. Principal*, 721 So. 2d 530, 532 (La. Ct. App. 1998) (applying intermediate scrutiny and finding no Equal Protection violation because "[i]t is not a common occurrence for boys in elementary school grades to wear earrings," and male earring ban served important governmental objectives of avoiding classroom distraction and instilling discipline by requiring conformance to community standards); *Hines v. Caston Sch. Corp.*, 651 N.E.2d 330, 335-36 (Ind. Ct. App. 1995) (applying intermediate scrutiny and finding no Equal Protection violation because

"the wearing of earrings by males is inconsistent with community standards of dress in Caston," and male earring ban served legitimate educational function of instilling discipline via enforcement of community standards of dress).

Accordingly, the Court finds that RMCA has preliminarily shown an exceedingly persuasive justification for the male earring ban in its uniform policy, and that Plaintiff has not shown a substantial likelihood of success on the merits of his case.

## II.  Irreparable Injury to Plaintiff

Had Plaintiff shown a substantial likelihood of success on the merits, irreparable injury would be presumed to flow from the constitutional violation. *Free the Nipple-Fort Collins*, 916 F.3d at 805-06. But because Plaintiff has not demonstrated a substantial likelihood of success on his claims, the Court must evaluate the injury that would befall John if he is forced to make a choice—remove his earrings during school hours or face dis-enrollment from RMCA via expulsion or transfer—during the pendency of this lawsuit. The Court does not take lightly the threat of expulsion, which is a serious consequence that has the potential to impede John's ability to get admitted at another District school. John can easily avoid that consequence, however, by removing his earrings during school hours during the pendency of this suit. If John ultimately prevails on his claims, he will likely be awarded damages and a permanent injunction against RMCA's enforcement of the earring ban going forward. Not wearing his earrings is perhaps harmful, but if it is not likely to be

a constitutional right, that harm is not irreparable.[9] *See id.* at 806 (in the context of constitutional claims, "the constitutional-violation-as-irreparable-injury principle . . . collapses the first and second preliminary-injunction factors"). Thus, the Court does not find that John will suffer irreparable injury if a preliminary injunction is not granted.

## III. Balance of Harms

As noted above, the harm to John if a preliminary injunction is not granted is that he will be forced to remove his earrings during the school day or face dis-enrollment, and may potentially suffer the ongoing infringement of his constitutional rights during the pendency of this lawsuit, if he were to ultimately prevail on his claims.

The harm to Defendants if a preliminary injunction is granted is that RMCA will be prohibited from even-handedly enforcing its uniform policy as to all students while the lawsuit is pending. School officials testified that administrators and teachers have spent a significant amount of time dealing with John's suspensions and appeals, and have encountered some difficulties in attempting to deal with John's wearing of earrings while the parties waited for a final decision from the board of directors regarding the earring policy. But much of that harm could be alleviated by simply allowing John to wear the earrings during the litigation. There was scant testimony as to whether John wearing earrings had caused any actual distraction that disrupted learning within the

---

[9]   The Court also notes that although the expedited briefing schedule permitted Plaintiff to file a reply brief, he chose not to do so. Additionally, the preliminary injunction hearing that was originally set for January 3, 2020 (*i.e.*, before RMCA was scheduled to resume classes following the winter break) was continued to January 14, 2020 at the request of Plaintiff's counsel.

- 28 -

classroom, as opposed to being the subject of hallway gossip outside the classroom and phone calls to administrators from other parents.

On the whole, for both sides, this seems to be more a matter of principle than direct harm. While the principles each side is fighting for are important, the potential harm to either side of awaiting a final decision on the merits does not appear to be great, and the harms seem relatively balanced.

## IV. Public Interest

It is always in the public interest to prevent the violation of a party's constitutional rights. *Free the Nipple-Fort Collins*, 916 F.3d at 807. But as noted above, John has not shown a substantial likelihood of success on the merits of his constitutional claim. And, providing a safe, effective, and distraction-free education to students attending public schools is also in the public interest. The Court finds that this factor is neutral and does not weigh in favor of either side.

## CONCLUSION

Plaintiff has failed to show a substantial likelihood of success on the merits of his claims. That factor alone is dispositive of his motion for a preliminary injunction.[10] And as discussed above, the other preliminary

---

[10] Under the preliminary injunction standard of a different circuit court, it is possible that John Doe might have prevailed. *See, e.g.*, *Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019) ("[D]istrict courts may grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets either of two standards: '(a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor.'"), *cert. granted*, No. 19-760, 2019 WL 6797733 (U.S. Dec. 13, 2019). The Court does believe that John has raised serious questions going to the merits of his claims. But under the law governing the Tenth Circuit as the Court

injunction factors are essentially neutral, and thus do not weigh decisively in his favor.

Accordingly, tor the foregoing reasons, it is ORDERED that Plaintiff's Fed. R. Civ. P. 65 Motion for a Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted [Doc. 13] is DENIED.

DATED: January 20, 2020                    BY THE COURT:

                                           _____
                                           Daniel D. Domenico
                                           United States District Judge

---

understands it, raising serious merits questions is not enough. Here, John must show a substantial likelihood of success on the merits, and that he has not done.